# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 03-CV-1193 (JFB)(MLO)
Nº 04-CV-5271 (JFB)(MLO)

———————————

### VINCENT VALENTI,

Plaintiff,

VERSUS

### MASSAPEQUA UNION FREE SCHOOL DISTRICT,

Defendant.

———————————

MEMORANDUM AND ORDER
September 5, 2006

———————————

JOSEPH F. BIANCO, District Judge:

In this employment discrimination case, plaintiff Vincent Valenti is a special education teacher at defendant Massapequa Union Free School District (the "School District"). Plaintiff is suing the School District for (1) intentional infliction of emotional distress ("IIED"), (2) for discriminating against him because of his gender, (3) for discriminating against him because he advocated for his disabled students, and (4) for retaliation. Plaintiff filed two separate actions in the Eastern District of New York, which are consolidated for purposes of this motion. The complaints are similar in that they both allege gender discrimination and retaliation. The second complaint adds a claim for a violation of the Americans with Disabilities Act. Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss both complaints in their entirety. For the reasons that follow, the motion for summary judgment is granted and the complaints are dismissed.

## I. BACKGROUND

### A. THE FACTS

The facts, construed in the light most favorable to plaintiff, the non-moving party, *see Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005), are as follows:

Vincent Valenti has been employed as a special education teacher in Massapequa Union Free School District ("Massapequa" or the "District") since in or about September 1984. (Def.'s 56.1 Statement ¶ 1.)[1] Valenti has taught at the high school level since 1987. (*Id.* ¶ 2.)

### 1. Valenti's Evaluation and Late Proctoring Assignments in June 2001

During the 2000/2001 school year, Valenti was absent eighteen days. (Pl.'s Counter 56.1 Statement ¶ 39.)

In 2001, Valenti's supervisor, Lori Saland, discussed Valenti's attendance record with him, and wrote in the "General Comments" section of Valenti's evaluation the following:

> Mr. Valenti is an excellent English teacher. He is an asset to the Special Education Department. He was frequently absent due to family issues. Hopefully, his attendance will be better next year.

(*Id.* ¶¶ 3, 4.) Valenti signed the evaluation on June 4, 2001. (*Id.* ¶ 5.) Because of the number of absences Valenti had in 2000/2001, James Maloney, the principal of Massapequa High School, asked Saland to ask Valenti about his health. (Pl.'s Counter 56.1 Statement ¶ 44.)

A female Special Education Teacher, Geri Bennett, was absent fourteen days during the 2000/2001 school year. (*Id.* ¶ 40.) Saland did not make any reference to the number of absences Bennett had during 2000/2001 in Bennett's evaluation. (*Id.* ¶ 41.)

Pursuant to the applicable Collective Bargaining Agreement, teachers were allotted ten sick days and two personal days per year. (Pl.'s Counter 56.1 Statement ¶ 42.) On or about June 7, 2001, Valenti wrote a memorandum to Saland asking her why she incorporated his attendance into his evaluation, and not into the evaluations of his female colleagues. (*Id.* ¶ 47.) Valenti requested that his evaluation be changed. (*Id.*) Saland refused to change Valenti's evaluation. (*Id.* ¶ 53.)

In June 2001, Saland assigned Valenti three late proctoring assignments during the final exam period. (*Id.* ¶ 48; Def.'s Ex. C.) Valenti wrote a letter, in red, to Saland stating the following:

> In regards to the Final Exam Schedule, I can not have PM assignments because I have commitments after work. This was an issue last year. This was an issue the year before. This was also an issue the year before the year before. Why do you keep assigning me PM assignments when you know I can't stay.?? [sic] Also, I would like to know why Jack and I are the only two that have been assigned three late assignments? In addition, why do the travelling teachers have the most PM assignments?

(*Id.*) Saland responded on June 8, 2001, stating, *inter alia*, the following:

> As this is the first time I worked on the assignments of teachers in our department, I have no knowledge of

[1] Where one party's 56.1 Statement is cited, the other party does not dispute the facts alleged, unless otherwise stated.

what has transpired in the past . . . .
Your assignment for June 14th can be
switched with Donna Fanning, thereby
reducing one of your late assignments.
In the future it would be more
appropriate to see me and discuss
these matters, rather than sending me
a memo typed in "RED". I find that
tactic totally disrespectful.

(*Id.*) Thereafter, on June 12, 2001, Dr.
Thomas A. McKillop, Jr., one of Valenti's
supervisors, wrote Valenti a memorandum,
stating, *inter alia*, the following:

Mrs. Lori Saland has just informed me
that you are refusing to proctor
upcoming exams . . . on June 15th and
. . . June 19th. According to Mrs.
Saland your refusal is based on the
fact that 2:35 PM is the contractual
sign out time and you are not required
to stay beyond that time . . . . [Y]our
proctoring is no different than any
other resource room teacher who is
expected to stay for the additional
hours that a student may require. May
I point out also that regular education
teachers are also assigned to extended
time proctoring and they too will be
expected to stay the additional hours
. . . . I certainly hope your response to
Mrs. Saland was made in haste, before
you had time to analyze all the facts,
and have since had the time to
reconsider and retract those remarks.
If not, and you continue to maintain
your erroneous position, I will treat
this as a direct act of insubordination
and pursue the outcome to the highest
level.

(*Id.*)

Thereafter, on July 3, 2001, Valenti filed
a complaint with the New York State Division
of Human Rights ("DHR") alleging that he
had been discriminated against because of his
sex by the District when Saland placed a
negative comment on his evaluation form.
(Def.'s 56.1 Statement ¶ 6.)

2. Valenti is Asked to Provide Lesson Plans
& is Given Late Proctoring Assignments in
Late 2001 and 2002

On November 13, 2001, Saland asked
Valenti to provide lesson plans and other
materials before his upcoming evaluation.
(*Id.* ¶ 8.) Valenti alleges that no other teacher
of equal seniority was required to provide this
material. (*Id.* ¶ 11.)

During the week of January 22 - 25, 2002,
Valenti was given late proctoring
assignments. (*Id.* ¶ 9.) According to the
January 2002 proctoring schedule, two male
teachers (including Valenti), and two female
teachers received late proctoring assignments
in January 2002. (*Id.* ¶¶ 10, 11.) In June
2002, nine of the ten female teachers in the
Special Education Department received late
proctoring assignments, and both of the male
teachers received late proctoring assignments.
(*Id.* ¶ 12.)

Thereafter, on February 2, 2002, Valenti
amended his DHR complaint to include
allegations that the District had discriminated
against him based on his sex by requiring him
to provide lesson plans and other materials,
and by assigning him late proctoring
assignments. (*Id.* ¶ 11.)

On or about May 2002, Valenti and
Fanning organized a Health Fair for students.
(Pl.'s Counter 56.1 Statement ¶ 70.) During
the Fair, Saland and Valenti had "difficulty

communicating with each other." (*Id.* ¶ 71.)

On March 11, 2003, after receiving a "right to sue" letter from the EEOC, Valenti filed an action in this Court, and was assigned docket number 03-CV-1193. (Def.'s 56.1 Statement ¶¶ 14, 15.)

### 3. Valenti is Given Late Proctoring Assignments in June 2003 and is Subjected to Increased Observation

In June 2003, six female teachers received late proctoring assignments. (*Id.* ¶ 16.) One female teacher received a late proctoring assignment on two days in June 2003. (*Id.*) Valenti was given a late proctoring assignment on June 17, 2003, and was on standby for proctoring on June 16, 2003. (*Id.* ¶¶ 17, 18.) The other male teacher in the Special Education Department did not receive any late proctoring assignments in June 2003. (*Id.* ¶ 16.)

On October 27, 2003, Valenti received notice from Saland that he would have an in-class observation and that he would have to attend a pre-observation conference. (*Id.* ¶ 19.) Another of Valenti's supervisors, Colleen Terriberry, scheduled a meeting with the parent of one of Valenti's students for November 25, 2003, at 10:00 a.m., the same time Valenti was scheduled to be observed by Saland. (*Id.* ¶¶ 19, 20.) Valenti testified in his deposition that Terriberry told him that Saland had requested that Terriberry schedule a meeting with the parent and Valenti on that date. (Valenti Dep. at 202, 205-06.) Valenti does not recall whether Terriberry told him that Saland requested that Terriberry schedule the meeting with the parent for a particular time that day. (*Id.*) Terriberry testified that she was not told by Saland to schedule the meeting at the same time as Saland was observing Valenti. (Terriberry Dep. at 13.) Terriberry also testified that she never told Valenti that Saland directed her to schedule the meeting. (*Id.* at 14.)

On December 2, 2003, Saland told Valenti that she needed to arrange for another in-class observation with him because she did not receive a written lesson plan from Valenti prior to the previous in-class observation. (Def.'s 56.1 Statement ¶ 11.) On January 26, 2004, Valenti was notified that he would have a second classroom observation on February 9, 2004. (*Id.* ¶ 23.) A female teacher in the District, Donna Fanning, was required to submit lesson and grade plans prior to her classroom observations more than half of the times during her career. (Pl.'s Counter 56.1 Statement ¶ 24.) Over the course of Fanning's career, she was observed more than once in four different school years. (*Id.* ¶ 56.) Only one of these occasions was after she was tenured, and this was at her request. (*Id.*)

On February 27, 2004, Jeff Silberman, a school psychologist, entered Valenti's classroom while Valenti was administering a science test and attempted to speak with Valenti about his annual review meetings and recommendations for the placements of Valenti's students. (*Id.* ¶ 25.) When Valenti told Silberman he could not speak to him during class, Silberman remained in the classroom. (*Id.*) Silberman unsuccessfully tried again, on March 4, 2004, to discuss Valenti's recommendations for the District's students. (*Id.* ¶ 26.)

On April 14, 2004, Valenti informed the District that he preferred to retain his currently-held teaching assignments for the following school year for Collaborative English and Collaborative Earth Science. (*Id.* ¶ 28.) Pursuant to the applicable collective

bargaining agreement, a teacher is entitled to request and receive two out of their five teaching preferences for the following school year unless such preferences are "preempted" for "sound educational reasons that are not arbitrary and capricious." (*Id.* ¶ 29.)

Thereafter, Valenti had a meeting with Dr. Blednick, and Dr. Blednick asked Valenti to change his preference for Collaborative English because, although two sections of Collaborative English had been taught during the 2003/2004 school year, only one section was going to be taught during the 2004/2005 school year. (*Id.* ¶¶ 30, 31, 32.)

Valenti had taught Collaborative English with another teacher, who had informed her department chairperson that she did not want to teach the class during the 2004/2005 academic year. (*Id.* ¶ 33.) Dr. Blednick told Valenti that the other two teachers who taught Collaborative English did not want to be split up, and that they compared ending their working relationship to a "divorce." (*Id.* ¶ 34.)

By letter dated May 14, 2004, Valenti wrote to Dr. Blednick "[a]s requested, I will change my aforementioned preference sheet from 'Collaborative English' to whatever class is available." (*Id.* ¶ 35.)

On April 23, 2004, Valenti received an e-mail and handwritten note from Saland, dated April 23, 2004, stating Valenti should check his e-mail every day. (*Id.* ¶ 27.) Saland never spoke to anyone in the technology department to determine whether Valenti's e-mail was working properly. (Pl.'s Counter 56.1 Statement ¶ 72.)

On or about June 23, 2005, Valenti submitted a charge of discrimination to the EEOC, alleging that he had been discriminated and retaliated against in violation of Title VII and the Americans with Disabilities Act (the "ADA"). (Def.'s 56.1 Statement ¶ 36.)

Thereafter, Valenti received a "right to sue" letter and filed suit in this Court and was assigned docket number 04-CV-5271.

### 4. Valenti's Disability Claims

Every year a Committee on Special Education ("CSE") meets to discuss teachers' recommendations about the appropriate placement of special education students for the following school year. (Pl.'s Counter 56.1 Statement ¶ 59.) During an annual review in 2002, Valenti recommended that four of his students be placed in mainstream or inclusion classes, rather than in self-contained special education classes. (*Id.* ¶ 61.) Prior to Valenti's recommendation, Valenti informed the parents of the four students that his personal opinion was that the students should be placed in mainstream classes. (*Id.* ¶ 62.) Valenti was ordered to stop offering his personal recommendation to students' parents. (*Id.* ¶ 67.) He was the only special education teacher ordered to stop offering his personal recommendation to parents. (*Id.* ¶ 68.)

Later, during the 2003/2004 school year, as discussed *supra*, Valenti was subjected to two in-class observations. Valenti believes this "increased supervision" was in retaliation for his previous complaints of discrimination, as well as his advocacy for his students. (*Id.* ¶ 69.)

### B. THE INSTANT ACTION

Plaintiff filed two separate complaints, on March 11, 2003, and December 3, 2004,

alleging the District violated his rights and discriminated against him in violation of Title VII, the ADA, and New York Executive Law. Both cases were assigned as related to the Honorable Sandra L. Townes. On February 21, 2006, the cases were reassigned to this Court. After discovery closed, but prior to defendant moving for summary judgment, plaintiff moved to stay any summary judgment motion because plaintiff had recently filed a new EEOC complaint, and expected to either amend one of the complaints to add new charges, or file a new action. Defendant opposed a stay, and on April 6, 2006, this Court denied plaintiff's motion to stay and set a briefing schedule for summary judgment. *See Valenti v. Massapequa Union Free School Dist.*, No. 03 Civ. 1193 (JFB), 2006 WL 898094 (E.D.N.Y. April 6, 2006).[2] On April 27, 2006, defendant moved for summary judgment. Oral argument was held on July 27, 2006.

---

[2] This Court denied plaintiff's request for a stay, holding that:

> Indeed, if this Court were to grant a stay based on this new incident and EEOC complaint, and allow plaintiff to amend the complaint and have additional discovery on the new incident, the motion for summary judgment and any eventual trial would be stayed *sine die*. Given the time that has passed in this case, and the fact that discovery has been closed for over seven months, the Court declines to issue a stay of defendant's summary judgment motion. Hence, the request for a stay is denied.

*Valenti*, 2006 WL 898094, at *2.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R. Co.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d

Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006). *See also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

## B. VALENTI'S DISCRIMINATION CLAIMS AGAINST THE SCHOOL DISTRICT

### a. Applicable Law

Title VII prohibits discrimination of an employee based on his gender.[3] *See* 42 U.S.C. § 2000e-2(a). Here, plaintiff claims he has been discriminated against by defendant on the basis of his gender.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000); *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step McDonnell

---

[3] In addition to alleging claims under Title VII, plaintiff alleges discrimination under New York State Human Rights Law. Claims of discrimination brought under New York state law are analyzed using the same framework as claims brought under Title VII, and the outcome under state law will be the same as the outcome under Title VII. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714-15 (2d Cir. 1996).

Douglas test. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected class (2) who performed his job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 802 n. 13 (1973) (noting that elements of prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (*en banc*).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); see *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "McDonnell Douglas's minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of McDonnell Douglas test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

b. Timeliness of Valenti's Claims Regarding Late Proctoring Duties on June 16 and 17, 2003

Defendant contends that Valenti's claims regarding late proctoring duties on June 16 and 17, 2003, are time-barred. Title VII provides that a discrimination claim is time-barred if an administrative complaint is not filed within the prescribed time period. *See* 42 U.S.C. § 2000e-5(e)(1); *Forsyth v. Fed'n Employment and Guidance Serv.*, 409 F.3d 565, 572 (2d Cir. 2005); *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 133 (2d Cir. 2003). Because New York has its own division of human rights, it is a so-called deferral state for purposes of Title VII. *Mohasco Corp. v. Silver*, 447 U.S. 807, 813-14 (1980); *Harris v. City of New York*, 186 F.3d 243, 247 n.2 (2d Cir. 1999). Hence, in New York, a plaintiff must file an administrative charge within 300 days of knowing or having reason to know of the alleged discriminatory act. *Harris*, 186 F.3d at 247 (holding that the statute of limitations runs "when [plaintiff] knew or had reason to know of the injury serving as the basis for his claim") (collecting cases). The charge may be filed with either the EEOC or the New York Division of Human Rights. *See Butts v. The City of New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)*, superceded by statute on other grounds as stated in Hawkins v. 1115 Legal Services Care*, 163 F.3d 684, 693 (2d Cir. 1998). "This requirement functions as a statute of limitations . . . in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) (internal citations omitted).

Plaintiff first alleged that he was assigned late proctoring on June 23, 2004, more than 300 days after these acts, which he alleges were motivated by gender discrimination. Hence, these claims are time-barred, unless an exception applies. Plaintiff alleges that this was a pattern and practice by defendant, and thus a "continuing violation." "[A] continuing violation may be found 'where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Quinn*, 159 F.3d at 766 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994)); *see also Annis v. County of Westchester*, 136 F.3d 239, 245-46 (2d Cir. 1998).

Plaintiff's "continuing violation" theory necessarily fails. There is no evidence that defendant has engaged in "discriminatory policies or practices," and none can be inferred from plaintiff's conclusory assertions in his papers. *See Int'l Board of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (holding that plaintiff must establish that "discrimination was the company's standard operating procedure"); *Falinski v. Kuntz*, 38 F. Supp. 2d 250, 257 (S.D.N.Y. 1999) ("The courts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of compelling circumstances.") (quotation marks omitted). Late proctoring assignments are discrete acts, and, as a result, the clock begins to run when the alleged discriminatory act occurs. *Morgan*, 536 U.S. at 114 ("Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the . . . 300-day time period after the discrete

discriminatory act occurred."); *Lightfoot*, 110 F.3d at 907-08; *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993) (noting that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation"). Where, as here, "there is a 'reasonably ascertainable date on which the act occurred, that is the day on which the statute began to run,' notwithstanding that plaintiff may still feel some effects as a result of the prior discriminatory act." *Malarkey v. Texaco, Inc.*, 559 F. Supp. 117, 121 (S.D.N.Y. 1982), *aff'd*, 704 F.2d 674 (2d Cir. 1983) (quoting *Marshall v. American Motors Corp.*, 475 F. Supp. 875, 884 (E.D. Mich. 1979) (cited with approval in *Lightfoot*, 110 F.3d at 907)). Thus, although the Court addresses whether any of defendant's late proctoring assignments are adverse employment actions, the claims alleging discrimination based on the two late proctoring assignments on June 16 and 17, 2003, are dismissed as time-barred.

c. Valenti's Prima Facie Case

Although the burden of establishing a *prima facie* case is minimal, in this case, plaintiff has failed to put forth facts establishing he was subjected to an adverse employment action.

A plaintiff suffers an adverse employment action when he experiences a "materially adverse change in the terms and conditions of employment." *Richardson v. N.Y. State Dep't of Corr. Servcs.*, 180 F.3d 426, 446 (2d Cir. 1999) (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). Typical adverse employment actions may include termination from a job, decrease in salary, material reduction in benefits or responsibilities, or a less distinguished title. *See Galabya v. N.Y.*

*City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Changes in assignments or duties that do not "radical[ly] change" the nature of work are not typically adverse employment actions. *Galabya*, 202 F.3d at 640 (quoting *Rodriguez v. Bd. of Ed.*, 620 F.2d 362, 366 (2d Cir. 1980)).

Plaintiff alleges the following "adverse employment" acts by defendant: (1) negative comments on his evaluation; (2) late proctoring assignments; and (3) increased supervision because he was required to provide lesson plans prior to being observed by Saland, and because he was observed by Saland on two occasions during one school year.

Viewing the evidence in a light most favorable to plaintiff, the Court concludes, as a matter of law, that plaintiff has failed to show that any of these acts by defendant were an "adverse employment action."

(1) Negative Employment Evaluation

Negative evaluations, without any accompanying adverse consequences, are not adverse employment actions. *See Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("Negative evaluations alone, without any accompanying adverse result, however, are not cognizable."), *aff'd* 205 F.3d 1327 (2d Cir. 2000); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir.1996) ("There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action."); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994) (holding that a "satisfactory" performance review that is lower than past reviews does not constitute an

10

adverse employment action); *Gallo v. Herman*, 97 Civ. 8359 (JSR), 1999 WL 249709, at *2 (S.D.N.Y. Apr. 28, 1999) (holding that a performance evaluation that is "still-high but not-quite-as-high-as-previous rating" is not an adverse employment action because it caused no "material impact" on terms and conditions of employment); *Castro v. N.Y. City Bd. of Ed.*, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (holding that negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions"); *accord Scafidi v. Baldwin Union Free School Dist.*, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003); *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 544 (E.D.N.Y. 2003); *Pellei v. Int'l Planned Parenthood*, 96 Civ. 7014 (WHP), 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 2999).  Of course, there are times when a negative evaluation does constitute an adverse employment action, if it is accompanied by, or results in, a change in conditions of employment.  In this case, however, there is no evidence that plaintiff suffered any change, much less a material change, in his employment as a result of this evaluation.

Further, it is a stretch to even call the comment on plaintiff's evaluation a "negative" comment.  The parties do not dispute that the overall evaluation was positive and favorable.  The relevant portion of the evaluation stated the following:

> Mr. Valenti is an excellent English teacher.  He is an asset to the Special Education Department.  He was frequently absent due to family issues.  Hopefully, his attendance will be better next year.

(Pl.'s Counter 56.1 Statement ¶ 4.)  Plainly, this comment is not negative, especially considering there is no evidence of any change in any way in the terms and conditions of Valenti's employment as a result of this evaluation.  *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (noting "[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse'").  Finally, Valenti's perception that this comment was negative does not make it adverse.  *See Garber v. New York City Police Dept.*, No. 95 Civ. 2516(JFK), 1997 WL 525396, at *6 (S.D.N.Y. Aug.22, 1997) (plaintiff's purely subjective feelings did not negatively alter terms and conditions of employment), *aff'd*, 159 F.3d 1346 (2d Cir.1998).  Hence, plaintiff's evaluation stating that he was "frequently absent" is not an adverse employment action.

(2) Late Proctoring Assignments

Plaintiff's contention that he suffered an adverse employment action by being assigned late proctoring assignments is unavailing.  The undisputed evidence is that every teacher in the Special Education Department was assigned late proctoring assignments.  As a matter of law, an employee who is required to do what every other similarly situated employee is required to do does not suffer an "adverse employment" action.  *See Richardson*, 180 F.3d at 466.  "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Galabya*, 202 F.3d at 640 (quoting *Crady*, 993 F.2d at 136).  Even if plaintiff received one more late proctoring assignment in a given month than other, female employees, it is still not enough to

make that assignment a "materially adverse" employment action. *See Galabya*, 202 F.3d at 641 (holding that to be an adverse employment action, the assignment must "constitute a setback to the plaintiff's career"). "[S]ubjective dissatisfaction with assignments does not constitute adverse employment action." *Harrison v. N.Y. City Off-Track Betting*, No. 99 Civ. 6075, 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); *Castro v. N.Y. City Bd. of Educ.*, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (holding that "not everything that makes an employee unhappy is an actionable adverse action"); *see also Brown v. Snow*, No. 02 Civ. 7985 (GEL), 2006 WL 623594, at *5 (S.D.N.Y. Mar. 13, 2006). Certainly there are situations where additional duties or alterations in responsibilities *could* qualify as adverse employment actions, but the action must result in a "materially significant disadvantage" to the employee. *Galabya*, 202 F.3d at 641; *see also Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 346 (S.D.N.Y. 2002) (reassignment to job with "undesirable shifts" and "erratic schedule" could be an adverse employment action). Here, plaintiff cannot point to any "materially adverse" change to his career, position, salary, benefits, or overall position as a tenured teacher as a result of the proctoring assignments he was required to perform. *See Richardson*, 180 F.3d at 446. Thus, the Court concludes as a matter of law that the claims by plaintiff alleging discrimination by defendant's assigning of late proctoring do not constitute adverse employment actions.[4]

### (3) Increased Supervision

Plaintiff's contention that he suffered an adverse employment action because he was subjected to "increased supervision" is rejected. For a claim of "increased supervision" to be actionable, it must be accompanied by "unfavorable consequences." *Scafidi*, 295 F. Supp. 2d at 239; *see also Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001). Although "close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." *Scafidi*, 295 F. Supp. 2d at 239 (quoting *Castro*, 1998 WL 108004, at *7). In this case, plaintiff has failed to even allege, much less submit admissible evidence, that he suffered any "unfavorable consequences" from the "increased supervision."

Hence, plaintiff's claims alleging violations of Title VII against defendant based on gender discrimination are dismissed, as the Court concludes as a matter of law that plaintiff has not suffered an adverse employment action.[5]

---

[4] As discussed *supra*, even if defendant's assignments of late proctoring were adverse employment actions, plaintiff's claims of late proctoring assignments on June 16 and 17, 2003, would be dismissed as time-barred. Defendant also argues that plaintiff's claims of late proctoring assignments in January 2002 are not exhausted. The Court disagrees. If plaintiff's claims alleging late proctoring assignments were adverse employment actions, the Court finds that they are "reasonably related" and encompassed by plaintiff's broadly-worded EEOC complaint. *See Butts*, 990 F.2d at 1401.

[5] Plaintiff also alleges miscellaneous complaints, including the following: (1) he was instructed to check his e-mail everyday, (2) a school psychologist interrupted his class and did not leave until the end of the period, and (3) he did not get to teach collaborative English during the 2004/2005 school year. The Court concludes that none of these actions rise to the level of adverse,

## C. HOSTILE WORK ENVIRONMENT

A hostile work environment, in violation of Title VII, is established by a plaintiff showing that his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. N.Y.*, 366 F.3d 138, 150 (2d Cir. 2004); *see also Richardson v. N.Y. Dep't of Correctional Servs.*, 180 F.3d 426, 437 (2d Cir. 1999). Other factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148 (quotation marks omitted). The Second Circuit has noted, however, that "while the standard for establishing a hostile work environment is high, . . . [t]he environment need not be 'unendurable' or 'intolerable.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace." *Feingold*, 366 F.3d at 150 (quotations and citation marks omitted).

Plaintiff's hostile work environment claims are dismissed, as the Court concludes as a matter of law that plaintiff has failed to show that his workplace was "permeated" with discriminatory intimidation that altered the conditions of his employment. *Howley*, 217 F.3d at 153. The Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to state a claim. *See Richardson*, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley*, 217

---

so to the extent plaintiff seeks relief under Title VII for these actions, the claims are dismissed. *See Bright v. LeMoyne College*, 306 F. Supp. 2d 244, 254 (N.D.N.Y. 2004) (holding that being given a different shift than the one requested not adverse employment action); *Scafidi*, 295 F. Supp. 2d at 239 (holding that failing to provide a key to the ladies room, no nameplate on office door, not being put on a committee, and not being invited to a graduation ceremony not adverse employment actions); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (concluding that listing a name wrong in the school directory, difficulty obtaining a parking permit, not named a department chair, and not assigned to teach summer courses not adverse); *Demuren v. Old Dominion Univ.*, 33 F.Supp.2d 469, 483-84 (E.D. Va.) (holding that plaintiff's exclusion from Dean Search Committee, failure to receive 1996 University Outstanding Research Award, and failure to receive Eminent Scholar status do not qualify as adverse employment actions), *aff'd,* 188 F.3d 501 (4th Cir.1999).

F.3d at 154 (quoting *Harris*, 510 U.S. at 23). The Court concludes, as a matter of law, that the alleged discriminatory conduct by defendant fails to rise to the severe level required to support a claim of hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" not discriminatory changes in the "terms and conditions of employment"); *Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Richardson*, 180 F.3d at 437; *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (holding that to meet his burden, the plaintiff must show "more than a few isolated incidents" and "evidence solely of sporadic" discrimination does not suffice); *Knight v. City of N.Y.*, 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004); *Ruggieri*, 146 F. Supp. 2d at 217-18 (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment"); *Francis v. Chem. Bank. Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents). Plaintiff's complaints, including increased supervision and late proctoring assignments, over the course of several years, are at best "episodic," and not "sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989).

Further, to succeed on a hostile work environment claim, plaintiff must link the actions by defendant to his gender. Although "facially neutral incidents may be included, of course, among the 'totality of the circumstance' that courts consider in any hostile work environment claim," plaintiff nevertheless must offer some evidence from which a reasonable jury could infer that the facially-neutral incidents were in fact discriminatory. *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002); *see also Nakis v. Potter*, 01 Civ. 10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec.15, 2004) (holding that "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable" under Title VII) (citing *Brenna v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.")). In this case, plaintiff has failed to connect any of the actions by defendant to his gender.

Thus, plaintiff's claims alleging a hostile work environment are dismissed.

### D. VALENTI'S RETALIATION CLAIMS AGAINST THE DISTRICT

Title VII also forbids an employer from retaliating against an employee who has engaged in a protected activity, such as filing an EEOC complaint or employment discrimination suit. *See* 42 U.S.C. § 2000e-3. To establish a *prima facie* case of retaliation, plaintiff must show that (1) he was engaged in protected activity; (2) the defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). As discussed *supra*, plaintiff has failed to allege that any of the actions taken against him were adverse, and thus plaintiff cannot state a claim for retaliation. Plaintiff contends that after he filed a DHR complaint in August

2001, he was subjected to increased supervision in November 2001. In addition, after plaintiff filed his first complaint in this Court in March 2003, plaintiff claims he was retaliated against when defendant assigned him late proctoring assignments. Both of plaintiff's retaliation claims are dismissed, as this Court concludes that plaintiff's allegations of increased supervision and late proctoring assignments are not adverse employment actions. *See Ruggieri*, 146 F. Supp. 2d at 218 ("Retaliation laws are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled.").

Thus, for the same reasons plaintiff's allegations of increased supervision and late proctoring assignments fail to support a claim for discrimination, they also fail to support a claim for retaliation, and they are dismissed.

### E. VALENTI'S ADA CLAIMS

Title I of the ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of a known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). "[T]o establish a prima facie case of 'association discrimination' under ADA § 102(b)(4), 42 U.S.C. § 12112(b)(4), a plaintiff must demonstrate the following:

(1) the plaintiff was 'qualified' for the job at the time of the adverse employment action;

(2) the plaintiff was subjected to adverse employment action;

(3) the plaintiff was known by his employer at the time to have a relative or associate with a disability;

(4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employe's decision."

*Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir. 1997); *see also Sacay v. Research Foundation of CUNY*, 193 F. Supp. 2d 611, 631 (E.D.N.Y. 2002); *Dollinger v. State Ins. Fund*, 44 F. Supp. 2d 467, 480 (N.D.N.Y. 1999).

Plaintiff's position in support of his associational discrimination claim is that he was engaging in a protected activity when he "advocated" for his disabled students. (*See* Opp. Mem. at 20-21.) Plaintiff was allegedly told to stop communicating his personal recommendation of student placement to parents. This, according to plaintiff, was an adverse employment action because it "diminished his responsibilities and prestige." (*Id.*)

Plaintiff's ADA claim is dismissed for two reasons. First, there is no support for the proposition that associational discrimination claims can be brought where someone is "advocating" on behalf of the disabled. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (dismissing associational discrimination claim as not-cognizable where doctor plaintiff alleged hospital discriminated against her because of her advocacy on behalf of disabled patients); *Oliveras-Sifre v. Puerto Rico Dep't of Health*, 214 F.3d 23, 26 (1st Cir. 2000) (dismissing associational discrimination claim where

plaintiffs allege they were "punished for their advocacy on behalf of individuals with AIDS"); *Barker v. Int'l Paper Co.*, 993 F. Supp. 10, 15 (D. Me. 1998) (dismissing suit brought by husband alleging he was fired "because of his advocacy on behalf of his wife"); *Lester v. Compass Bank*, 96-AR-812-S, 1997 WL 151782, at * (N.D. Ala. Feb. 10, 1997) (holding that "an individual who champions the cause of a disabled individual" does not state a claim under Title I).

In *Freilich*, a doctor claimed that the hospital "coerced, intimidated, threatened, or interfered" with her because of her advocacy on behalf of her disabled patients. 313 F.3d at 215. In rejecting her associational discrimination claim, the Fourth Circuit noted that if it were to allow such a claim, "[e]very hospital employee" would be able to "allege at least a loose association with disabled patients." *Id.* Allowing the plaintiff in *Freilich* "to proceed on such a basis would arm every hospital employee with a potential ADA complaint." *Id.* Similarly, if Valenti's claim alleging associational discrimination were allowed to proceed, nearly every special education teacher would be able to allege "at least a loose association" with a disabled person.

Plaintiff's position is that the ADA protects him when he communicates with the parents of his disabled students. Associational discrimination ensures "that a qualified employee is not discriminated against because an employer assumes, without foundation, that the employee's association with a person with a disability . . . will require the employee to miss work or frequently leave work early in order to care for the disabled person." *Sacay*, 193 F. Supp. 2d at 629. Indeed, the EEOC Interpretative Guidance provides three examples of forbidden

associational discrimination: (1) refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative; (2) discharging an employee who does volunteer work with AIDS victims, due to fear that the employee may contract the disease; and (3) denying health benefits to a disabled dependent of an employee but not to other dependents, even where the provision of benefits to the disabled dependent would result in increased health insurance costs for the employer. 29 C.F.R. Pt. 1630.8 app. at 349 (1996); *see Den Hartog*, 129 F.3d at 1084 n.6. Nothing in the wording of the statute, the EEOC Interpretative Guidance, or the case law, supports an ADA associational disability claim brought by a teacher who "advocates" for his disabled students. *See Freilich*, 313 F.3d at 215. Hence, plaintiff's claim alleging associational discrimination is dismissed as a matter of law because Title I of the ADA does not allow relief for a teacher alleging an adverse employment action resulting from "advocacy" on behalf of his disabled students.

Second, even if the ADA allowed a claim by plaintiff for advocating on behalf of his disabled students, the ADA claim would be dismissed because, as discussed *supra*, plaintiff has not suffered an adverse employment action.

Plaintiff alleges that, after he advocated on behalf of his disabled students, he was told to "cease communication concerning his personal recommendations with the students and their parents." (Opp. Mem. at 21.) This, according to plaintiff, "significantly diminished his position responsibilities and prestige." (*Id.*) Plaintiff submits no evidence in support of this statement, nor does he cite to anywhere in the record tending to show his position responsibilities and prestige were

"diminished." Indeed, there is no evidence that plaintiff has suffered any materially adverse employment action as a result of his "advocacy" on behalf of his disabled students. *See Galabya*, 202 F.3d at 640; *Richardson*, 180 F.3d at 466; *Castro*, 1998 WL 108004, at *7.

Hence, plaintiff's claim alleging violations of the ADA is dismissed, as the Court concludes as a matter of law that plaintiff has failed to state a claim of associational discrimination, and has failed to allege that he suffered a materially adverse employment action.

## F. Intentional Infliction of Emotional Distress

To prevail on a claim for IIED under New York law, plaintiff must plead and prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress. *See Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996); *Ruggieri*, 146 F. Supp. 2d 202, 222 (E.D.N.Y. 2001); *Howell v. N.Y. Post Co.*, 596 N.Y.S.2d 350, 353 (1993).

In analyzing an IIED claim, courts look to the first element – whether the conduct was extreme or outrageous. *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999). Without "sufficiently outrageous" conduct, no claim for IIED can be established. *Howell*, 596 N.Y.S.2d at 353 ("[T]he 'requirements of the rule are rigorous, and difficult to satisfy.'") (quoting Prosser & Keeton on Torts § 12, at 60-61 (W. Page Keeton ed., 5th ed.1984))).

Plaintiff does not submit any examples of what he perceives to be extreme and outrageous conduct on the part of defendant. (*See* Opp. Mem. at 22-23.) This is for good reason, as the evidence in this case falls far short of showing conduct that is "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.*, 461 N.Y.S.2d 232, 236 (1983). Assuming plaintiff is claiming IIED based on the same conduct that gave rise to his discrimination claims, that conduct, even if true, and even if discriminatory, is not the extreme conduct that gives rise to an IIED claim. "In the employment context, conduct rarely meets the strict standard for IIED without some combination of public humiliation, false accusations of criminal or heinous conduct, verbal threats, permanent loss of employment, or conduct contrary to public policy." *Ruggieri*, 146 F. Supp. 2d at 222-23; *Howell*, 596 N.Y.S.2d at 353 ("Indeed, of the IIED claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous."). As discussed herein, there is insufficient evidence to support any claim that plaintiff suffered an adverse action against him, much less sufficiently outrageous conduct by the defendant to support an IIED claim.

Thus, as no reasonable juror could find in favor of plaintiff on his IIED claim, summary judgment is granted in favor of defendant and this claim is dismissed.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety and both complaints are dismissed. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 5, 2006
Brooklyn, NY

\* \* \*

Plaintiff is represented by Scott M. Mishkin, Esq., One Suffolk Square, Suite 240, Islandia, New York, 11749. Defendant is represented by John P. Sheahan, Esq., of the Law Offices of Guercio & Guercio, 77 Conklin Street, Farmingdale, New York 11735.